UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RASZELL REEDER,

                                    Plaintiff,

                                                        9:15-CV-01078
v.
                                                        (MAD/TWD)
DDS BELL, et al.,

                                    Defendants.
_____

APPEARANCES:                                OF COUNSEL:

RASZELL REEDER
94-A-6388
Plaintiff pro se
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953

LETITIA JAMES                               JOHN F. MOORE, ESQ.
Attorney General for the State of New York  Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## **ORDER AND REPORT-RECOMMENDATION**

## I.      **INTRODUCTION**

        Plaintiff Raszell Reeder commenced this *pro se* civil rights action under 42 U.S. § 1983

on September 3, 2015.  (Dkt. No. 1.)  The claims remaining in the action following initial review

under 28 U.S.C. §§ 1915(e) and 1915A by the Hon. Mae A. D'Agostino, U.S. District Judge,

are: (1) Eighth Amendment excessive force/failure to intervene claims against Defendants former

Deputy Superintendent for Security at Upstate Correctional Facility ("Upstate") Bell ("DSS

Bell"), Captain Bishop ("Bishop"), Sergeant Smith ("Smith"), Corrections Officer ("C.O.") Reif ("Reif"), C.O. Ramsdell ("Ramsdell"), and Lieutenant Salls ("Salls"); and (2) Eighth Amendment conditions of confinement claim against Defendants Lieutenant Quinn ("Quinn") and Smith. (Dkt. No. 17 at 20-21.[1]) Plaintiff's claims arise out of events that occurred during his confinement at Upstate where all of the Defendants, employees of the Department of Corrections and Community Supervision ("DOCCS"), were working during the relevant time period. (*See generally* Dkt. No. 1.)

Following the September 17, 2018, denial of Plaintiff's motion to amend his complaint (Dkt. Nos. 95, 118), Defendants Bell and Quinn moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 121.) Plaintiff has filed responsive papers. (Dkt. No. 126.) For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Defendant Bell

On April 8, 2015, Plaintiff was being housed in the Special Housing Unit ("SHU") at Upstate. (Dkt. No. 121-5 at 21.) The door on Plaintiff's cell had two hatches, one at the bottom for the transfer of cleaning supplies, and the feed-up hatch in the middle for things like meals and being handcuffed. *Id*. at 23. Plaintiff became frustrated and kicked the lower hatch breaking the lock. *Id*. at 24. Approximately thirty minutes later, he mixed a combination of urine and feces and put the liquid into milk cartons to throw on whoever happened to walk by his cell. *Id*. at 24.

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

Plaintiff threw the mixture out the open bottom hatch as Upstate Superintendent Uhler ("Uhler") walked by his cell, hitting Uhler and A DOCCS Assistant Commissioner. (Dkt. Nos. 121-4 at ¶ 10; 126 at 31; 121-5 at 25-26.)

DSS Bell was informed by Bishop that Plaintiff had broken the bottom hatch of the door to his cell and thrown a brownish liquid at Uhler and a DOCCS Assistant Commissioner. (Dkt. No. 121-4 at ¶ 10.[2]) According to Plaintiff, DSS Bell and Sall, along with other members of the security staff, a contamination unit, and an extraction unit responded to the incident. *Id*. at 28-31.

DSS Bell left before the door to Plaintiff's cell was opened. *Id*. at 33-34. According to DSS Bell, procedures required that Plaintiff be moved to another cell so the hatch could be repaired and the cell searched for evidence. (Dkt. No. 121-4 at ¶ 11.) DSS Bell states in his declaration that Bishop informed him Plaintiff refused to leave his cell and requested authorization from DSS Bell to extract Plaintiff by force. *Id*. at ¶ 11. The Unusual Incident and Use of Force Reports prepared in connection with the incident, submitted by Plaintiff, state that prior to the extraction, Plaintiff refused to exit his cell after being spoken to by all available staff. (Dkt. No. 126 at 17, 24). When DSS Bell was informed that Plaintiff had refused to comply with a lawful order to leave his cell, Bell authorized his staff to use chemical agents and, if Plaintiff still refused to exit his cell, to use physical force to extract him. *Id*. at ¶ 12. Plaintiff was thereafter subjected to the use of chemical agents and physical force by Upstate security staff members in extracting him from his cell. (Dkt. Nos. 121-4 at 36-77; 126 at 24.)

---

[2] Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

Section five of DOCCS Directive 4903, entitled "Use of Chemical Agents," authorizes the use of chemical agents when necessary to remove an inmate from his cell.  (Dkt. Nos. 121-4 at ¶¶ 2-3; 124-1 at 3.)  When practicable, the inmate's health record is to be reviewed prior to the administration of a chemical agent to determine whether the inmate has a health condition that would make exposure of the agents dangerous.  (Dkt. Nos. 121-4 at ¶ 4; 124-1 at 3.)  In this case, Upstate Nurse Rosanna Lordi reviewed Plaintiff's medical records and determined the agents would not be harmful to his health.  (Dkt. No. 121-4 at ¶ 14.)  When employing chemical agents, security staff is to use two one-second bursts (one application) until the inmate complies, with no more than five applications.  (Dkt. Nos. 121-4 at ¶ 5; 124-1 at 3.)

DOCCS Directive 4944, entitled "Use of Physical Force," provides at III(E) that "[a]n employee shall not lay hands on or strike an inmate unless the employee reasonably believes that the physical force to be used is reasonably necessary "for self-defense; to prevent injury to person or property; to enforce a lawful direction; to quell a disturbance; or to prevent an escape."  (Dkt. No. 121-8 at 2.)  According to DSS Bell, in accordance with Directives 4903 and 4944, chemical agents may be employed when an inmate refuses to leave his cell after being directed to do so by security staff, and an inmate may be forcibly removed from his cell if he refuses to leave his cell after five applications of the chemical agents.  (Dkt. No. 121-4 at ¶¶ 8-9.)

 Plaintiff claims he complied with all orders and put his hands in the feed-up hatch when directed so that he could be handcuffed for removal from his cell.  (Dkt. Nos. 1-1 at 2; 121-5 at 36-38.)  According to Plaintiff, instead of handcuffing him, Sall slammed the hatch door on his hands.  (Dkt. No. 121-5 at 36-77.)  Plaintiff claims two canisters of chemical agents were improperly used on him, and he was physically assaulted when he was extracted from his cell

4

following the use of the chemical agents.  *Id*.

Plaintiff has submitted no evidence that DSS Bell had any reason to disbelieve Bishop at the time of the authorization or that Bell was aware of what transpired in the extraction until he reviewed video of the incident after the fact.  (Dkt. Nos.  121-5 at 84; 126 at 7.)  Plaintiff acknowledged at his deposition that Bell was not present during the extraction and used no force against Plaintiff.  (Dkt. No. 121-5 at 33-34, 80.)  Bell also denies being present when his staff administered the chemical agents and forcibly extracted Plaintiff from his cell.  (Dkt. No. 121-4 at ¶ 16.)

At his deposition, Plaintiff testified that his claim against DSS Bell is limited to authorization of the use of chemical agents, authorization of the use of two rather than just one canister, and knowledge that both canisters were faulty causing them to release too much chemical agent.  (Dkt. No. 121-5 at 82-86, 107-08.)  According to Bell, it was standard procedure to bring two canisters to the inmate's cell in case one malfunctions, and Plaintiff's claim that Bell authorized the use of two canisters is inaccurate, as is his claim that Bell knew the two canisters were defective.  (Dkt. No. 121-4 at ¶ 13.)

### B.    Defendant Quinn

After Plaintiff was extracted from his cell on April 8, 2015, he was seen by a nurse, decontaminated, and moved to cell 11-C-10.  (Dkt. Nos. 121-3 at ¶3; 121-9 at 115.)  Plaintiff alleged in his complaint and testified at his deposition that he was left in the cell for three weeks with only undershorts and no sheets, blanket, or pillow, and that two air vents blew cold air into

his cell leaving him very cold during the three weeks.[3]  *Id*.  (Dkt. Nos. 1 at 5; 121-5 at 112-16, 119.)  At his deposition, after his recollection was refreshed by a grievance he had submitted, Plaintiff acknowledged that he remained in the cell with only his undershorts from April 8 to April 23, 2015, less than three weeks.  (Dkt. No. 121-5 at 125.)  In Grievance No. UTS-55995-15, dated April 23, 2015, Plaintiff claimed he was without clothing, bed linen, underwear, blankets, towels, and wash cloths, and that two vents blew very cold air into his cell.[4]  (Dkt. Nos. 121-5 at 127, 134; 126 at 29.)   According to Plaintiff, everything was returned to him by Defendant Smith and another officer on April 23, 2015.  (Dkt. No. 121-5 at 126-27, 143.)

Plaintiff testified at his deposition that it was Smith who deprived him of his clothes (other than one pair of undershorts), sheets, blankets, and toiletries because he was the area supervisor and the one who gave the orders.  *Id*. at 113-14.  However, Plaintiff claims that Quinn was responsible for getting Plaintiff's clothes back because Office of Mental Health ("OMH") psychologist John Marinelli ("Marinelli"), who saw Plaintiff regularly during the time he was confined in the cell, reported the conditions to Quinn in his capacity as Watch Commander, and Quinn did nothing.  (Dkt. Nos. 1 at 5; 121-9 at 117, 120-21.)

---

[3] When questioned at his deposition whether Quinn had anything to do with the temperature in his cell, Plaintiff replied "no."  (Dkt. No. 121-5 at 116.)  Moreover, Plaintiff testified that he never complained to Quinn about the temperature of his cell.  *Id.* at 117.  Therefore, the Court has construed Plaintiff's conditions of confinement of claim against Quinn to be limited to personal necessities such as clothing, footwear, bed linen, underwear, blankets, pillow, towels, and toiletries.

[4] On appeal of Grievance No. UST-55995-15, the Central Office Review Committee ("CORC") found that Defendant Smith had stated that Plaintiff's clothes became unusable during the decontamination process and were replaced, other clothing in his cell was decontaminated and returned to him, and bedding supplies were issued in a timely manner. (Dkt. No, 126 at 31.)

Plaintiff testified at his deposition that he did not know exactly what Marinelli told Quinn about the conditions under which he was being housed from April 8 through April 23, 2015. (Dkt. No. 121-9 at 122.)  However, both Plaintiff and Defendants have submitted copies of a July 20, 2015, note Plaintiff sent to Marinelli in which he asked Marinelli to confirm that he had spoken to Quinn and Smith about Plaintiff being in cell 11-C-10 without "sheets, blankets, pillow, property, cosmetics, sneakers, slippers" and that he "only had on one undershorts and the two cold ventillators was on."[5]  (Dkt. Nos. 121-6 at 2; 126 at 34.)  The note includes Marinelli's July 21, 2015, response in which he wrote "[y]es I spoke to them, several times.  I remember you telling me this, I do not remember the dates.  Check w/DOCCS about when you received the return of your items. [initialed by Marinelli]."  *Id*.

1.   Marinelli Declaration

Marinelli has submitted a declaration in support of Quinn's motion for summary judgment.  (Dkt. No. 121-3.)  According to Marinelli, he had several conversations with Plaintiff while making rounds on C Gallery in 11 building for three weeks beginning April 9, 2015, and to the best of his knowledge Plaintiff "was not just in his underwear during these conversations and was not missing any necessities such as clothes, sheets, blankets, or toiletries."  *Id.* at ¶ 5.  Marinelli has also stated that Plaintiff was fully clothed when Marinelli saw him being taken from his cell to be interviewed by the State Police on April 9, 2015.[6]  *Id*. at ¶ 4.

Marinelli claims Plaintiff complained about many things, including his desire to return to

---

[5]  Quotations are as written unless otherwise indicated.

[6]  Plaintiff acknowledges in his response papers that two corrections officers gave him clothes to wear when he spoke with Inspector General Skiff on April 9, 2015, but told him he had to return all of the clothing and sneakers when he returned to the cell.  (Dkt. No. 126 at 27.)

A gallery and wanting a pair of headphones, but in direct conflict with the representations made in his July 21, 2015, note to Plaintiff, claims to have no recollection of Plaintiff "ever complaining to him about being deprived of any necessities such as clothes, sheets, blankets, or toiletries." *Id*. at ¶ 6.  Marinelli claims that if such complaints had been made, he would have intervened on Plaintiff's behalf.  *Id*.  According to Marinelli, shortly after Plaintiff complained about the headphones and housing, Marinelli informed Smith about the headphones, who shortly thereafter arranged for Plaintiff to receive them.  *Id*. at ¶¶ 7-8.  Marinelli also claims to have told Quinn about Plaintiff's wish to return to A Gallery.  *Id*. at ¶ 7.

Contrary to his July 21, 2015, note, Marinelli now denies ever having advised either Smith or Quinn that Plaintiff had complained about being deprived of any necessities such as clothes, sheets, blankets, or toiletries.  *Id.* at ¶ at 9.  Marinelli does acknowledge his receipt of Plaintiff's note of July 20, 2015, seeking confirmation that Marinelli had spoken to Quinn and Smith about Plaintiff having only his undershorts, being without sheets, blankets, pillow, property, cosmetics, sneakers, and slippers, and the cold air vents, as well as his July 21, 2015, response to Plaintiff acknowledging that he had done so.  (Dkt. 121-6 at ¶ 6.)

However, Marinelli attempts to explain away the conflict between his July 21, 2015, affirmative response to Plaintiff and his present denial that he ever spoke to Smith or Quinn about complaints by Plaintiff that he was being deprived of those items by claiming that "[he] did not carefully read the plaintiff's request, which I now realize inaccurately stated that the plaintiff had complained to me about being deprived of "'sheets, blankets, pillow, property, cosmetics, sneakers, slippers . . .' and that I had so notified Lieutenant Quinn and Sergeant Smith." (Dkt. No. 121-3 at ¶ 10.)  Plaintiff questions Marinelli's claim that he had not carefully read Plaintiff's

July 20, 2015, note before responding.  (Dkt. No. 126 at 28.)

Plaintiff challenges the veracity of other statements in Marinelli's declaration as well.  *Id.* at 27-28.  According to Plaintiff, Marinelli is aware that inmates are denied headphones from a Tier III disciplinary report, and that when an inmate is removed from a Company for a violent act, he cannot return to that Company.  *Id.* at 27.  Moreover, Plaintiff contends he did not ask that he be moved back to A Gallery.  *Id.*  Rather, he asked Marinelli that he be moved to another cell because of the two vents blowing cold air on him.  *Id.*

Plaintiff also claims Marinelli is being dishonest by denying that he noticed Plaintiff had no clothes on each time he visited, and that Plaintiff had no cosmetics, underwear, footwear, mattress, or bed linen.  *Id.*  Plaintiff relies on the April 23, 2015, Male Inmate Call Out Sheet, which schedules him for a Shop Call-Out to obtain items of clothing to replace pants, shirts, socks, T-shirts, and undershorts damaged by the use of force as soon as possible.  *Id.* at 37.  Plaintiff was given a Shop Call-Out date of May 6, 2015.  *Id.*

2.   Quinn Declaration

Defendant Quinn also submitted a declaration in support of his motion.  (Dkt. No. 121-2.)  Quinn acknowledges being Watch Commander at Upstate from 2006 to 2016.  *Id.* at ¶ 1.  According to Quinn, as Watch Commander he was responsible for supervising the security staff at Upstate during one of the three eight hour tours of duty.  *Id.*  Quinn does not describe his duties and responsibilities in supervising the security staff in any detail, stating only that he "had no responsibility for ensuring that inmates at Upstate Correctional Facility were provided with clothes, bedding, toiletries, or any other property."  *Id.* at ¶ 3.  Quinn says nothing about whether his supervision of the security staff would have included taking action if he learned that the

9

security staff was intentionally depriving an inmate of clothing, bedding, and the other items Plaintiff claims he did not have from April 8 through April 23, 2015.  (Dkt. No. 121-2.)

Quinn denies ever being advised by Marinelli that Plaintiff had complained about being deprived of any necessities such as clothes, sheets, blankets, or toiletries.  *Id*. at ¶ 4.  Quinn claims Marinelli only told him of Plaintiff's wish to be moved to A Gallery.  *Id*.  According to Quinn, "he had absolutely no involvement with, or knowledge of, what clothes, bedding, toiletries, or other property the plaintiff did or did not have."  *Id*. at ¶ 5.

## III.  APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue

of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation). *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro*

*se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[7] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    FAILURE TO RESPOND TO MOVANTS' STATEMENT OF MATERIAL FACTS

Plaintiff has failed to respond to Defendants' Statement Pursuant to L.R. 7.1(a)(3) setting forth the material facts as to which Defendants assert no genuine issue of fact exists. (*See generally* Dkt. No. 126.) L.R. 7.1(a)(3) provides that "<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>."

While *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to pro se litigants . . . does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules." *Liberati v. Gravelle*, No. 12-CV-00795 (MAD/DEP), 2013 WL 5372872, at *7 (N.D.N.Y. Sept. 24, 2013) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)); *Latouche v. Tompkins*, No. 09-CV-0308 (NAM), 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2911) ("a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a

---

[7] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

summary judgment motion").

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[8]  *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted); *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (requirement that pro se be advised of possible consequences of failing to respond to summary judgment motion, including movant's statement of material facts pursuant to local rules); L.R. 56.2 ("Notice to Pro Se Litigants of the Consequences of Failing to Respond to a Summary Judgment Motion").

Courts in this district have found it appropriate to enforce L.R. 7.1(a)(3) and its predecessor L.R. 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon the opposing party's failure to properly respond to the statement.  *See, e.g., Borihane v. Outhouse*, No. 9:05-CV-1256 (NAM/DEP), 2007 WL 2071698, at *3 (N.D.N.Y. July 18, 2007) (following L.R. 7.1(a)(3) and accepting statement of material

---

[8]  Both defense counsel and the Clerk's Office provided Plaintiff with copies of the requisite notice of the consequences of his failure to respond properly to Defendants' summary judgment motion, including the failure to respond to Defendants statement of material facts. (Dkt. Nos. 121 at 4; 122 at 2.)

facts as uncontroverted) (citing *Elgamil v. Syracuse Univ.*, No. 99-CV-611 (NPM/GLS), 2000

WL 1264122, at * 1 (N.D.N.Y. Aug. 22, 2000) (listing cases)).

However, the Second Circuit has ruled that "[a] district court has broad discretion to

determine whether to overlook a party's failure to comply with local court rules, "including local

rules relating to requirements regarding the submission of and response to statements of material

facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz*

*v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks

omitted).  In deference to Plaintiff's *pro se* status, the Court has opted to review the entire

summary judgment record on the Defendants' motion.

## V.    ANALYSIS

### A.    Defendant Bell

Plaintiff claims that Defendant Bell violated his Eighth Amendment right to be free from

excessive force by authorizing the use of force and chemical agents by DOCCS personnel in

extracting Plaintiff from his cell.  (Dkt. Nos. 1 at 5; 121-5 at 82-83.)  Plaintiff further claims that

Bell authorized the use of two containers of chemical agents when only one was allowed, and

that Bell knew both containers were faulty and released too much of the chemical agent.  (Dkt.

Nos. 1 at 5; 121-5 at 86.)

#### 1.    Legal Standards for Eighth Amendment Excessive Force

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments . . .

including the unnecessary and wanton infliction of pain." *Giffen v. Crispen*, 193 F.3d 89, 91 (2d

Cir. 1999) (citation and internal quotation marks omitted).  An Eighth Amendment excessive

force claim has two components – "one subjective focusing on the defendant's motive for his

14

conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268)) (internal quotation marks omitted). The test for wantonness on an excessive force claim "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted maliciously or wantonly, "a court must examine several factors including: the extent of the injury and mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.") (citation and internal quotation marks omitted)).

The objective component requires a showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (citation omitted).

### 2.    Application

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.

Plaintiff makes no claim that DSS Bell was present during the use of chemical agents or any use of physical force in extracting Plaintiff from his cell. (Dkt. No. 121-5 at 33-34.) The undisputed evidence establishes that DSS Bell authorized the use of chemical agents and, if necessary, physical force to extract Plaintiff from his cell only after being informed by Bishop that Plaintiff was refusing to leave his cell. (Dkt. No. 121-4 at ¶ 11.) There is no evidence

16

whatsoever in the summary judgment record supporting Plaintiff' conclusory assertions that DSS Bell was aware that the chemical agents he had authorized were used improperly, *i.e.*, two instead of only one canister, that the canisters were defective thus allowing too much of the chemical agents to be released, or that Plaintiff was subjected to excessive physical force during the extraction.  To the contrary, DSS Bell has stated in his declaration that it was standard procedure for staff to bring a back-up canister in case one malfunctioned, and there was no indication that either canister taken to Plaintiff's cell was defective.  (Dkt. No.  121-4 at ¶¶ 13-14.)  Moreover, Plaintiff appears to be claiming that DSS Bell only learned about the manner in which the chemical agents were used and alleged excessive force when he watched videos of the incident after the fact when it would have been too late for him to intervene.  (Dkt. No. 126 at 7.)

In light of the foregoing, the Court finds that none of the *Colon* criteria apply, and there is no showing that DSS Bell had the necessary level of culpability to satisfy the subjective component of Plaintiff's excessive force claim.  *See Scarbrough v. Thompson*, No. 10-CV- 901, 2012 WL 7761439, at *10 (N.D.N.Y. Dec. 12, 2012) (summary judgment granted to supervisory officials who authorized the use of chemical agents in a cell extraction but were not present at the extrication and were unaware that excessive force would be used on the plaintiff).  Therefore, the Court finds that DSS Bell is entitled to summary judgment and recommends the District Court grant his motion.

**B.    Defendant Quinn**

1.    Legal Standards for an Eighth Amendment Conditions of Confinement Claim

Plaintiff has alleged an Eighth Amendment conditions of confinement claim against

Quinn for his failure to remedy certain conditions under which Plaintiff was housed in cell 11-C-10 from April 8 to April 23 of 2015.  (Dkt. No. 1 at 5.)  While the Eighth Amendment "does not mandate comfortable prisons . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Champion*, 452 U.S. 337, 349 (1981) (internal quotation marks omitted)); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

A claim alleging prison conditions have violated the Eighth Amendment must satisfy both an objective and a subjective component.  *Walker*, 717 F.3d at 125.  To satisfy the objective component, a plaintiff must establish that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of serious harm."  *Farmer*, 511 U.S. at 834.  An inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker,* 717 F.3d at 125.  Health includes the risk of serious damage to "physical and mental soundness."  *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)).  Prison officials violate the Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions."  *Walker,* 717 F.3d at 125 (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)).  There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights.  *Id.* (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).  "The conditions themselves must be evaluated in light of contemporary standards of decency."  *Jabbar,* 683 F.3d at 57 (citation and internal quotation marks omitted)*.*

To satisfy the subjective component a plaintiff must establish that the "defendant official

acted with a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety." *Walker,* 717 F.3d at 125 (citations and internal quotation marks omitted).  To constitute deliberate indifference under the subjective element, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at 57; *see also Trammel v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the subjective element in cases involving prison conditions is "deliberate indifference to inmate health or safety.").  "The official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Mere negligence is not enough.  *Id.* at 835.

### 2.    Application

Plaintiff claims Marinelli, whom he saw regularly during the period of deprivation, spoke to Quinn in his capacity as Watch Commander about the deprivations from which Plaintiff was suffering, and Quinn took no action.  (Dkt. Nos. 1 at 5; 121-9 at 117, 120-21.)   Plaintiff relies, in part, on the notes he and Marinelli exchanged on July 20 and 21, 2015, in which Marinelli confirmed he had spoken to Quinn and Smith about the deprivations several times in support of his conditions of confinement claim against Quinn.  (Dkt. 1-1 at 6.)

In opposing Plaintiff's motion, Marinelli denies the representation he made in his July 21, 2015, note to Plaintiff, and Quinn denies ever being told or knowing about the deprivations.  (Dkt. Nos. 121-2 at ¶ 5; 121-3 at ¶ 9.)  Moreover, although Quinn denies that he had any responsibility for ensuring that inmates were provided with clothes, bedding, toiletries, or any other property, he does not address what duties, if any, he would have as Watch Commander if he were informed that the security staff he supervised was depriving Plaintiff of those things.

19

(*See* Dkt. No. 121-2.)

On a summary judgment motion, a court may not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). "The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury." *Id*. at 856. *See also Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (on a summary judgment motion "the court should not weigh evidence or assess the credibility of witnesses . . . . These determinations are within the sole province of the jury.").

The Court finds that viewing the evidence most favorable to Plaintiff, Marinelli's July 21, 2015, note acknowledging he had spoken to Quinn several times regarding the deprivations, raises a credibility issue with regard to Quinn's knowledge of the deprivations. The Court further finds that the credibility assessment is not one for the Court, and that the weighing of the evidence and determinations as to which version of events to accept is for the jury. Therefore, the Court recommends that Defendant Quinn's motion for summary judgment be denied.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 121) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED** that the motion be **GRANTED** as to Defendant Bell and **DENIED** as to Defendant Quinn; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with

the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:  May 7, 2019
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[9] If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

2007 WL 2071698
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Inthanousone BORIHANE, Plaintiff,
v.
Robert OUTHOUSE, Sheriff, Defendant.

No. 9:05-CV-1256.
|
July 18, 2007.

**Attorneys and Law Firms**

Inthanousone Borihane, pro se.

Kenneth M. Alweis, Esq., Sandra J. Sabourin, Esq., of Counsel, Goldberg Segalla, LLP, Syracuse, NY, for the Defendant.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

 **\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge David E. Peebles, duly filed on the 25th day of June, 2007. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion seeking the entry of summary judgment dismissing plaintiff's complaint against him (Dkt. No. 22) is granted, and the plaintiff's complaint is dismissed in all respects on the basis of mootness.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Inthanousone Borihane, a federal prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against Cayuga County Sheriff Robert Outhouse, alleging deprivation of his civil rights occurring during a time when he was a federal detainee at the Cayuga County Jail ("CCJ"), awaiting sentencing on a bank robbery conviction. In his complaint, plaintiff alleges that while at the CCJ, he was denied access to a pastor, clergy, priest, or other ordained person for religious worship, and a proper law library and related materials meeting minimum standards under the governing state regulations. The remedial portion of plaintiff's complaint seeks only equitable relief, in the form of an order directing his transfer to a facility where he would be permitted to worship and afforded access to a proper law library.

Defendant has moved seeking dismissal of plaintiff's claims against him. Defendant's motion is predicated upon plaintiff's transfer out of the CCJ and into a federal prison facility, an occurrence which, Outhouse asserts, renders plaintiff's claim for injunctive relief academic. For the reasons set forth below I agree, and therefore recommend that defendant's motion be granted.

I. *BACKGROUND*

When his complaint in this action was filed, plaintiff was an inmate incarcerated in the CCJ, located in Auburn, New York, awaiting sentencing on a federal conviction. [1] Complaint (Dkt. No. 1) ¶ 6. During the times relevant to his claims, plaintiff was housed in the facility's Restrictive Housing Unit ("RHU"). *Id.* Plaintiff maintains that while confined in the CCJ RHU he was subject to constitutional deprivations falling into two distinct areas. [2]

Initially, plaintiff's complaint alleges that he was not provided with adequate legal resources and assistance while confined within the RHU. *Id.* at ¶ 7. Specifically, plaintiff asserts that the law library at the CCJ did not include all of the materials required under the New York

Code of Rules and Regulations; did not offer the services of a notary public available to inmates, upon request, also as required; and did not make available a trained person to help him with his preparation of legal documents. Complaint (Dkt. No. 1) Attachment ¶ 4. Plaintiff further claims that over time, his requests for photocopies and law books were denied or severely restricted by prison officials, and these actions had the effect of unlawfully interfering with his access to the courts. *Id.* at ¶¶ 2, 3.

**\*2** The second aspect of plaintiff's claim surrounds defendant's alleged failure to provide him with access to a pastor or other clergy member while housed in the RHU, despite his multiple requests. *Id.* at ¶ 1. Borihane contends that this denial unlawfully interfered with the free exercise of his chosen religion. [3] Complaint (Dkt. No. 1) ¶ 6.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on October 3, 2005, and was subsequently granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 4. In his complaint, plaintiff alleges interference with the free exercise of his religious beliefs and impaired access to the courts due to the inadequacy of the law library at the CCJ and the denial by prison officials of his requests for legal materials. Plaintiff's complaint requests only equitable relief, seeking a directed transfer to another facility where he would have access to the requisite religious and legal resources; plaintiff has not requested recovery of monetary damages against the defendant. [4] Complaint (Dkt. No. 1) ¶ 9.

Issue in the case was joined on July 7, 2006 by the filing of an answer generally denying plaintiff's allegations and asserting various affirmative defenses including, *inter alia,* the lack of existence of a justiciable controversy, in light of plaintiff's transfer to another jail facility. Dkt. No. 9. Defendant has since moved, by motion filed on February 15, 2007, under Rules 56 and 12(b)(1) & (6) of the Federal Rules of Civil Procedure, in the alternative, urging dismissal of plaintiff's claims against him as moot, based upon his transfer out of the CCJ. Dkt. No. 22. Defendant's motion, to which plaintiff has filed no opposition, is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Legal Significance of Plaintiff's Failure to Oppose Motion*

Confronted with a motion by the defendant seeking dismissal of his complaint, plaintiff has not provided the court with the benefit of any argument as to why that motion should not be granted. Before turning to the merits of defendant's motion, I must address the plaintiff's failure to respond to that motion and determine what, if any, consequences should result from that failure.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). While recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Pub. Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.), courts in this district have found it appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b)(3) based upon a *pro se* plaintiff's failure to respond. *Robinson v. Delgado,* 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted in this instance, even in the absence of opposition, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001)

(Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

**\*3** While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to his motion, plaintiff has left the facts set forth in defendant's Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have found it appropriate to enforce Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[5] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this longstanding practice and, notwithstanding plaintiff's *pro se* status, accept defendant's assertion of facts as set forth in his Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendant's motion for facial sufficiency.

### B. *Summary Judgment Standard*[6]

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*4** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (stating that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Mootness*

Article III of the United States Constitution confers upon federal courts the authority to decide actual cases and controversies. *Catanzano v. Wing,* 277 F.3d 99, 107 (2d Cir.2001); *see also Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 1253 (1990); *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950-51 (1969). Consequently, a federal court presented with an action in which no live controversy exists may not entertain jurisdiction, but instead order dismissal of the case as moot. *Catanzano,* 277 F.3d at 107.

Addressing the concept of mootness, the Second Circuit has noted that

[t]he hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed.

*Martin-Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). Under most circumstances, the transfer of an inmate plaintiff complaining of civil rights violations out of the prison facility in which those violations are alleged to have occurred presents just such a situation, thus mooting any claim for injunctive relief against prison officials of the transferring facility. *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006); *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996); *Young v. Coughlin,* 866 F.2d 567, 568 n. 1 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224 (1989); *Beyah v. Coughlin,* 789 F.2d 986, 988 (2d Cir.1986); *Candelaria v. Greifinger,* No. 96-CV-0017, 1998 WL 312375, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).

The constitutional deprivations of which Borihane now complains allegedly occurred while he was confined as an inmate within the CCJ. It has been established to the court's satisfaction, both by virtue of plaintiff's failure to respond to the portion of defendant's Local Rule 7.1(a)(3) Statement making this allegation, and from the court's own records, that plaintiff is no longer an inmate at that facility, having instead apparently been transferred into the custody of the Federal Bureau of Prisons, following his sentencing in connection with his bank robbery conviction. *See* Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 22-6) ¶ 3; *see also* Dkt. No. 14. Since it thus appears that plaintiff is no longer incarcerated at the CCJ, and there is no reason to conclude that the defendant, as the Cayuga County Sheriff, has any further involvement with the terms and conditions of Borihane's confinement, plaintiff's complaint, which seeks only equitable relief including a transfer to another facility where he can be provided with the requested legal and religious materials and services, must be dismissed as moot. *Prins,* 76 F.3d at 506; *Salahuddin,* 467 F.3d at 272.

## IV. *SUMMARY AND RECOMMENDATION*

**\*5** In his complaint plaintiff has sought only equitable relief, and does not request monetary damages arising from the alleged denial of his constitutional rights. Since commencement of this action, plaintiff has been transferred out of the CCJ, which the constitutional violations of which he complains are alleged to have occurred, and the named defendant is no longer responsible for the conditions of his confinement. Plaintiff's claims for equitable relief against the defendant are therefore moot, and must be dismissed for failure to satisfy the case and controversy requirement of Article III of the United States Constitution. It is therefore hereby

RECOMMENDED that defendant's motion seeking the entry of summary judgment dismissing plaintiff's complaint against him (Dkt. No. 22) be GRANTED, and that plaintiff's complaint, be DISMISSED in all respects on the basis of mootness.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

## All Citations

Not Reported in F.Supp.2d, 2007 WL 2071698

---

Footnotes

1    At the times relevant to his claims, plaintiff was in the custody of the United States Marshal. Because there is no federal facility for housing unsentenced detainees in this district, the United States Marshal contracts with various local authorities, including Cayuga County, for the housing of federal inmates awaiting trial and/or sentencing.

2    Plaintiff also alleges, generally, that his rights to due process, equal protection, and freedom from cruel and unusual punishment were violated, but makes no specific factual allegations in his complaint or the accompanying attachment to support any of those general claims. Complaint (Dkt. No. 1).

**WESTLAW** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

3   According to his complaint, Borihane is a practicing Christian. *See* Complaint (Dkt. No. 1) Attachment at ¶ 1.

4   An application by plaintiff for leave to amend his complaint was denied by order issued on December 20, 2006, based upon his failure to comply with the requirements of this court's local rules that he provide a copy of a fully integrated, proposed amended complaint with his motion. Dkt. No. 20. It appears that plaintiff's motion sought leave to name additional defendants and, while injunctive relief remained the focus of plaintiff's quest for relief, to add a claim for recovery of $5,000 "to cover any occurring expenses for filing [his] complaint and for hindering [his] spiritual growth with God." Dkt. No. 14 at p. 23.

5   According to Local Rule 7.1(a)(3), "[a]ny facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

6   Because the defendant has answered, his motion, to the extent that it seeks relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure, is no longer appropriate; instead, under such procedural circumstances a defendant intending to challenge the facial sufficiency of a pleading should move for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure-a provision which gives rise to an analysis generally informed by the same principles as those applicable to motions brought under Rule 12(b)(6). *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). In light of the fact that the defendant has moved in the alternative under Rule 56, and submitted a Local Rule 7 .1(a)(3) Statement in support of his application for summary judgment, I have treated defendants' motion as seeking the entry of summary judgment, and have analyzed it on that basis.

---

**End of Document**                                                  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1264122

2000 WL 1264122
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.

No. 99-CV-611 NPMGLS.
|
Aug. 22, 2000.

**Attorneys and Law Firms**

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 et seq. ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

> shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See, e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy, Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D.N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

# BACKGROUND

**\*2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the

exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer.[2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

**\*3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee, authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new

advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators;[3] as mentioned, Clawson, not Roopnarine, authored the exam question.

 **\*4** Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was

submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

> [t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating.[4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

## DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden

of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

### I. Hostile Environment

Title IX provides, with certain exceptions not relevant here, that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, ––––, 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

### A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v.*

2000 WL 1264122

*New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and

inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382,

at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment"). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

**B. Actual Knowledge / Deliberate Indifference**
Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[.]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d] the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to

occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced

the grading of her third research methods exam.[8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[9]

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1264122

Footnotes

1    Amended January 1, 1999.

Elgamil v. Syracuse University, Not Reported in F.Supp.2d (2000)

2000 WL 1264122

2    Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

3    Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

4    Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

5    In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, ——, 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

6    Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

7    As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

8    As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

9    Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

---

**End of Document**                                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

Attorneys and Law Firms

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.)[1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

# I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.)[2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See
generally* Dkt. No. 1.) For a more detailed description of
Plaintiff's claims, and the factual allegations giving rise to
those claims, the reader is referred to Part III.B of this
Decision and Order.

# II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the
Court finds that Plaintiff may properly commence this
action *in forma pauperis.* (Dkt. No. 2.)

# III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the
sufficiency of the allegations that Plaintiff has set forth in
his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is
because Section 1915(e)(2)(B) directs that, when a plaintiff
seeks to proceed *in forma pauperis,* "(2) ... the court shall
dismiss the case at any time if the court determines that
—... (B) the action ... (i) is frivolous or malicious; (ii) fails
to state a claim on which relief may be granted; or (iii)

seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–

61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the

Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

*\*4* Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that

Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily

committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible

connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that*

*may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future

wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof

presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that

substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

Footnotes

1    This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y.

filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2      At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3      The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

4      *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5      *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6      It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson*).

7      *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8      Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

9      Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10      The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The

2012 WL 651919

Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

11    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12    *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability.' [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13    *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

---

**End of Document**                                     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1103045
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton
Correctional Facility; Michael B. King, Sgt.,
Clinton Correctional Facility; D. Mason, C.O.,
Clinton Correctional Facility; B. Malark, C.O.,
Clinton Correctional Facility; John Reyell, C.O.,
Clinton Correctional Facility; Bob Fitzgerald, R.N.,
Clinton Correctional Facility; John Doe, C.O. (C.O.
Gallery Officer Company Upper F–6); John Doe,
C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State
of New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge.

## INTRODUCTION

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.

Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in
part. Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims of
medical indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment
on plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force claims
against defendant Reyell are subject to dismissal for lack
of personal involvement. (Dkt. No. 61). Plaintiff does not
object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C.
§ 636(b) (1)(c), this Court conducts a *de novo* review of
these issues. The Court reviews the remaining portions of
the Report–Recommendation for clear error or manifest
injustice. *See Brown v. Peters,* 1997 WL 599355, \*2–3
(N.D.N.Y.), *af'd without op., 175 F.3d 1007 (2d Cir.1999);
see also Batista v. Walker,* 1995 WL 453299, at \*1
(S.D.N.Y.1995) (when a party makes no objection to a
portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

## DISCUSSION

### I. Local Rule 7.1(a)(3)

Latouche v. Tompkins, Not Reported in F.Supp.2d (2011)

2011 WL 1103045

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [1]

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties. [2]

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006)

(citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able

2011 WL 1103045

to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at \*7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

## III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" .[3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be

inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

[T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may

ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1103045

Footnotes

1    Local Rule 7.1(a)(3) provides:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

2      While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

3      Officer Rock is not a defendant herein.

---

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5372872
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Aldo Contreras LIBERATI, Plaintiff,

v.

GRAVELLE, Sgt., Clinton County Jail, Defendant.

No. 9:12–CV–00795 (MAD/DEP).
|
Sept. 24, 2013.

**Attorneys and Law Firms**

Aldo Contreras Liberati, Philipsburg, PA, pro se.

Lemire, Johnson Law Firm, Gregg T. johnson, Esq, Mary E. Kissane, Esq, of Counsel, Malta, NY, for Defendant.

### ORDER

MAE A. D'AGOSTINO, District Judge.

**\*1** On May 14, 2012, Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging that upon arrival at Clinton County Correctional Facility, Defendant used excessive force against Plaintiff, causing him injury. *See* Dkt. No. 1. On December 28, 2012, Defendant moved for summary judgment seeking dismissal of Plaintiff's claim pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 22–7 at 5. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated Plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Dkt. No. 22–7. Plaintiff failed to oppose Defendant's motion for summary judgment. *See* Dkt. No. 31 at 6.

In a Report–Recommendation and Order dated August 9, 2013, Magistrate Judge Peebles recommended that the Court grant Defendant's motion for summary judgment and dismiss Plaintiff's complaint. *See* Dkt. No. 31 at 2. Specifically, although Magistrate Judge Peebles found that questions of fact preclude granting the motion on

exhaustion grounds, he found that the motion should be granted on the merits because no reasonable factfinder could conclude that Defendant violated Plaintiff's Eighth Amendment rights. *See* id. at 21. Neither party objected to Magistrate Judge Peebles Report–Recommendation and Order.

On February 5, 2012, Plaintiff was transferred to Clinton Correctional Facility ("Clinton") located in Dannemora, New York. *See* Dkt. No. 22–2 at 3. During the transfer, the corrections officers escorting Plaintiff called Clinton to notify them that Plaintiff was difficult and combative. *See id.* Upon arrival, the staff at Clinton prepared Plaintiff for housing by performing the routine intake and booking procedures. See id. at 4. Part of the normal procedure was to conduct a patdown search to detect any contraband that was not detected by the "BOSS" chair. *See id.* at 3. During the pat-down, Plaintiff disobeyed orders on at least two occasions when he refused to face and keep his hands on the wall. See id. at 4.

When the Clinton officers realized that Plaintiff had a second layer of pants underneath his jeans, they instructed him to remove them in a private changeout room. See id. at 4. After removal of the pants Plaintiff refused to remain on the wall, so they attempted to physically restrain him. See id. at 5. Upon hearing this commotion, Defendant entered the changeout room to assist with the situation. See id. He observed Plaintiff resisting the officers that were trying to restrain him. See id. Defendant administered "a single, one second, application of O.C. spray towards other officers to continue to gain control over Plaintiff and secure his hands." *Id* . After he administered the spray, Defendant placed it back in his holster and retreated to allow the other officers to gain control of Plaintiff. See id. Although Defendant remained in the room, he used no further force against him other than to place his feet near the Plaintiff to prevent him from putting his hands under his body. See id. at 5–6. When the Plaintiff was fully secured, Defendant left the room. See id. at 6. Plaintiff was then escorted to a holding cell to provide him an opportunity to calm down, decontaminate his eyes with eye wash and see medical staff at the facility. See id.

**\*2** Plaintiff's verified complaint alleges that Defendant punched him in the head twice and that he did not file a grievance regarding these allegations because the corrections officers at Clinton refused to provide him with the necessary form. See id. at 2.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Morever, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' *"Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. See id. at 295 (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidenced" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Upon review of Magistrate Judge Peebles' Report–Recommendation and Order, the Court finds that the report correctly determined that Defendant's motion for summary judgment should be granted. In support of the motion for summary judgment, Defendant argues that he did not violate Plaintiff's Eighth Amendment rights because there is no record evidence that he punched Plaintiff in the head or used excessive force. *See* Dkt. No. 22–7 at 8–11. To state a claim for excessive force, a plaintiff must show defendant's acts are "incompatible with 'the evolving standards of decency that mark the process of a maturing society,' or involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958); *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). Even though the Eighth Amendment does not mandate that prisons be comfortable, they must be sufficiently humane. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The

subjective element is satisfied when plaintiff demonstrates that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the alleged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry looks at "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 6 (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)).

The objective element examines the harm inflicted in relation to "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8). Malicious or sadistic harm caused by prison officials, notwithstanding the extent of injury, always violates the "contemporary standards of decency." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9). The amount of force is examined in proportion to the need reasonably perceived by prison officials and what, if anything, did they do to limit such force. *See Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

In the present matter, no evidence in the record suggests that Defendant, Gravelle used force maliciously or sadistically against Plaintiff. The record reveals that action was initiated against Plaintiff in response to his repeated failures to obey orders to keep his hands on the wall during the pat-down search. Defendant administered a single O.C. spray to assist the corrections officers and then moved away from Plaintiff, using no more force or spray than was necessary to control Plaintiff. The undisputed material facts make clear that no reasonable factfinder could conclude that Defendant used malicious or sadistic force against Plaintiff because such actions were taken in response to Plaintiff's failure to obey orders and the need to restore order. Although Plaintiff's claim that Defendant punched him in the head would constitute malicious or sadistic force in violation of Plaintiff's Eighth Amendment rights, there is no evidence in the record to support such claim. Therefore, Plaintiff fails to state a claim that Defendant violated his Eighth Amendment rights.

**\*4** After careful review of Magistrate Judge Peebles' Report–Recommendation and Order, the parties' parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 9, 2013 Report–Recommendation and Order is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 22) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Aldo Conteras Liberati has commenced this action pursuant to 42 U.S.C. § 1983, alleging the deprivation of his rights under the United States Constitution. In his complaint, plaintiff alleges that, upon his arrival at the Clinton County Correctional Facility ("Clinton"), he suffered injuries arising from the use of excessive force by defendant Gravelle, a sergeant corrections officer stationed at Clinton at the times relevant to this action.

Currently pending before the court is defendant's motion for summary judgment on the merits, and based also on plaintiff's failure to exhaust the available administrative remedies and defendant's assertion that he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

I. *BACKGROUND* [1]
On February 5, 2012, plaintiff was transported to Clinton, located in Dannemora, New York, by United States immigration officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 8. Prior to his arrival at Clinton, immigration officers called Clinton to notify staff that, during the transport,

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.  3

plaintiff was difficult and combative. *Id.* Upon arriving at Clinton, facility staff began to prepare plaintiff for housing by subjecting him to routine intake and booking procedures. *Id.* at ¶ 10. This process included scanning plaintiff using a "BOSS" chair, which is designed to detect any metal contraband, as well as pat-searching him in a private room called the "changeout room" for any contraband not detected by the BOSS chair. [2] Id. at ¶¶ 3, 10.

During the pat-search, plaintiff was directed by Clinton corrections officers to face and keep his hands on the wall. Gravelle Decl. (Dkt. No. 22–2) at ¶ 11. On at least two occasions, however, plaintiff disobeyed this order, and turned toward the officer conducting the search. Gravelle Decl. Exh. A (traditionally filed) at 0:33, 1:05. At some point during the search, the officer performing the pat-down discovered that plaintiff was wearing a second layer of pants underneath his jeans. Gravelle Decl. (Dkt. No. 22–2) at ¶ 12. Plaintiff was then directed to move into a more private part of the changeout room and remove his jeans. *Id.* When plaintiff refused to remain on the wall after he removed his jeans, several Clinton corrections officers attempted to take physical control of the plaintiff to restrain him. *Id.;* Gravelle Decl. Exh. A (traditionally filed) at 1:11.

**\*5** Moments after the pat-search began, defendant Gravelle, whose office is located nearby the changeout room, heard the commotion arising from plaintiff's search, and went to assist the other officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:15. Upon entering the changeout room, defendant observed plaintiff resisting the officers attempting to restrain plaintiff. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13. Defendant immediately directed one, single application of "O.C. spray" to regain control of plaintiff. [3] Gravelle Decl. (Dkt. No. 22–2) at ¶¶ 13, 14; Gravelle Decl. Exh. A (traditionally filed) at 1:17. Defendant then moved back away from Liberati and allowed the other corrections officers to secure plaintiff's hands. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:18. Although defendant remained in the changeout room until plaintiff was secured, he did not use any further force against him. Gravelle Exh. A (traditionally filed) at 1:18–2:16. After plaintiff was secured, Clinton corrections officers escorted him to a holding cell to provide him opportunity to clam down, following which his eyes were decontaminated with

eye wash and he was seen by medical staff at the facility. Gravelle Dec. (Dkt. No. 22–2) at ¶ 15.

In plaintiff's verified complaint, he alleges that defendant punched him twice in the head. Compl. (Dkt. No. 1) at 8. He also contends that he did not file a grievance regarding these allegations due to the refusal of corrections officers at Clinton to provide him with the necessary form. *Id.* at 2.

## II. *PROCEDURAL HISTORY:*
Plaintiff commenced this action on May 14, 2012, by the filing of a complaint, motion to stay deportation, and application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1–3. Plaintiff's complaint is comprised of eight claims, and names six defendants, including defendant Gravelle. *See generally* Compl. (Dkt. No. 1). On August 27, 2012, District Judge Mae A. D'Agostino issued a decision and order granting plaintiff's request to proceed IFP, denying his motion to stay deportation, and dismissing all claims with the exception of plaintiff's Eighth Amendment excessive force cause of action asserted solely against defendant Gravelle. Dkt. No. 9.

Now that discovery in this matter is closed, the remaining defendant, Sergeant Gravelle, has moved for the entry of summary judgment, dismissing plaintiff's remaining claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 22. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Def.'s Memo. of Law (Dkt. No. 22–7).

**\*6** Defendant's motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Oppose Defendant's Motion*
The court's local rules require that a party seeking summary judgment must submit a statement of material

facts that it contends are undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). The local rules also instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.,* Nos. 09–CV0360, 09–CV–0363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).[4] To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

In this instance, defendant Gravelle has complied with local rule 7.1(a)(3), providing a statement setting forth twenty-three facts to which, he contends, there is no genuine triable issue. Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 22–6). Plaintiff, however, has failed to respond either to that statement, or to defendant's motion generally.[5] See *generally* Docket Sheet.

By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.).

**\*7** Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's rule 7.1(a)(3) statement, Dkt. Nos. 22–1, 24–1, but has nonetheless failed to do so, I have construed defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only

Case 9:15-cv-01078-MAD-TWD Document 137 Filed 05/07/19 Page 60 of 75
Liberati v. Gravelle, Not Reported in F.Supp.2d (2013)
2013 WL 5372872

in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Exhaustion of Available Administrative Remedies*

**\*8** In his motion, defendant Gravelle argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 22–7) at 11–12.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." [6] *Jones v. Bock,* 549 U.S. 199, 216 (2007). In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the

plaintiff's complaint is subject to dismissal. *See Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [7]

There are grievance procedures in place and available to any Clinton inmate who desires to complain regarding prison conditions at the facility. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17; Johnson Decl. Exh. B (Dkt. No. 22–5). In this case plaintiff's complaint, which is signed under penalty of perjury, and thus has the same force and effect as an affidavit, [8] alleges that he requested a grievance form from Clinton corrections officers but they refused to provide one to him. Compl. (Dkt. No. 1) at 4, 8. In support of his motion, defendant Gravelle avers that plaintiff did not file a grievance regarding the events giving rise to this action while at Clinton. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17.

**\*9** Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, although there is no record evidence to suggest that grievance procedures at Clinton were not fully available to plaintiff while he was at the facility, plaintiff does allege that corrections officers stationed at the facility refused to provide him with a grievance form. Under ordinary circumstances, this could justify a recommendation to the assigned district judge that she hold a hearing to develop plaintiff's allegation regarding special circumstances pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011). However, as is discussed more fully below, because I recommend that defendant's motion be granted based on a finding that no reasonable factfinder could conclude that defendant violated plaintiff's rights, a determination of whether plaintiff should be precluded from bringing this action based on a failure to exhaust administrative remedies is not necessary.

### D. *Plaintiff's Excessive Force Claim*

In support of defendant's motion, defendant Gravelle argues that there is no record evidence to support the allegation that he punched plaintiff, and that the record instead supports a finding that defendant's use of force against plaintiff did not violate his Eighth Amendment rights. Def.'s Memo. of Law (Dkt. No. 22–7) at 8–11.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981)).

**\*10** A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and

the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (internal quotation marks omitted), accord, *Blyden,* 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins,* 559 U.S. at 37; *Hudson,* 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted); *see also Griffin,* 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8); *see also Blyden,* 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991), accord *Hudson,* 503 U.S. at 8; *see also Wright,* 554 F.3d at 268. "But when

prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins,* 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano,* 998 F.2d at 105.

 **\*11** Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003)) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")).

In this case, although plaintiff's complaint alleges that defendant Gravelle punched him twice in the head, there is no record evidence to support his claim. Compl. (Dkt. No. 1) at 8. Instead, the record reveals that defendant used O.C. spray against plaintiff on one occasion during the course of an altercation with corrections officers, while those officers attempted to gain control over him. The video recording submitted in support of defendant's motion shows defendant coming into the changeout room after plaintiff was already on the ground with several officers trying to restrain him. Defendant quickly applied the O.C. spray to plaintiff's face, and then moved away from plaintiff and the other officers. According to defendant, corrections officers initiated the use of force against plaintiff as a result of his failure to obey orders to keep his hands on the wall during the pat-search. Defendant's use of force lasted a matter of seconds, and he sprayed plaintiff only to assist corrections officers in restraining him. In addition, although defendant states that plaintiff was seen by medical staff at Clinton

following the incident, nothing in the record, including plaintiff's complaint, indicates that plaintiff suffered a physical injury as a result of the incident. In light of all of this record evidence, I find that no reasonable factfinder could conclude that defendant used force against plaintiff maliciously or sadistically, or for any other purpose than restoring order. *See Kopy v. Howard,* No. 07–CV0417, 2010 WL 3808677, at \*3 (N.D.N.Y. Aug. 11, 2010) (Treece, M.J.), *report and recommendation adopted by* 2010 WL 3807166 (N.D .N.Y. Sept. 21, 2010) (Hurd, J.) (granting summary judgment where the record evidence demonstrated that the defendants used pepper spray on the plaintiff only once after plaintiff was repeatedly ordered to return to his cell and plaintiff suffered no injuries). Accordingly, I recommend that defendant's motion be granted. [9]

IV. *SUMMARY AND RECOMMENDATION*
In defendant's motion, he challenges the legal sufficiency of plaintiff's excessive force claim. Because the record contains a dispute of material fact as to whether plaintiff's failure to exhaust available administrative remedies may be excused, defendant is not entitled to dismissal on that basis. However, after a careful review of the record evidence, including a video recording of defendant's use of force, I find that no reasonable factfinder could conclude that defendant violated plaintiff's Eighth Amendment rights.

 **\*12**  Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 22–7) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 86 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5372872

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    A camera is installed in the changeout room. *Id.* at ¶ 10. In support of his motion, defendant submitted, as Exhibit A to his declaration, a copy of the recording from plaintiff's intake during the pat-search on February 5, 2012. Gravelle Decl. Exh. A (traditionally filed).

3    The term "O.C. spray" is not defined in defendant's motion papers. *See,* e.g., Gravelle Decl. (Dkt. No. 22–2); Def.'s L.R. 7 .1(a)(3) Statement (Dkt. No. 22–6).

4    Copies of all unreported decisions cited have been appended to this report for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

5    Plaintiff's response was due on January 22, 2013. Notice to Plaintiff (Dkt. No. 24). On July 24, 2013, the court received a letter from plaintiff requesting leave to file a response in opposition to the pending motion. Dkt. No. 29. Because plaintiff's request was over six-months late, and he was adequately put on notice previously of the consequences of failing to respond to defendant's motion, and in light of the unfair prejudice that defendant would incur as a result of such a delayed response, I denied that motion. Text Order Dated July 24, 2013.

6    In this case, defendant Gravelle raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 14 at ¶ 14.

7    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

8    18 U.S.C. § 1746; *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes[.]").

9    Because I recommend dismissal of plaintiff's complaint based on the merits, I have not considered defendant's qualified immunity argument.

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 7761439
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lester Lee SCARBROUGH, Jr., Plaintiff,
v.
Steven D. THOMPSON, Sergeant, Upstate
Correctional Facility; Timothy Arquitt, Correctional
Officer, Upstate Correctional Facility; Thomas
Smith, Correctional Officer, Upstate Correctional
Facility; Brian Gary, Correctional Officer,
Upstate Correctional Facility; Bruce Truax,
Correctional Officer, Upstate Correctional
Facility; Bryan Clark, Correctional Officer,
Upstate Correctional Facility; Paul Burgess;
Robert H. Reynolds; John Matejaik; Steven Salls;
Thomas Quinn; Donald Quinn; Gary Gettmann;
Marla Travers; and David Rock, Defendants.[1]

No. 10–CV–901 (TJM/CFH).
|
Dec. 12, 2012.

**Attorneys and Law Firms**

Lester Lee Scarbrough, Jr., Niagra Falls, NY, pro se.

Hon. Eric T. Schneiderman, Michael G. Mccartin,
Esq., of Counsel, Assistant Attorney General, Attorney
General for the State of New York, Albany, NY, for
Defendants.

**REPORT–RECOMMENDATION AND ORDER**[2]

CHRISTIAN F. HUMMEL, United States Magistrate
Judge.

**\*1** Plaintiff pro se Lester Lee Scarbrough, Jr.
("Scarbrough"), a former inmate in the custody of
the New York State Department of Correctional and
Community Supervision ("DOCCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that fifteen officials
and employees of DOCCS violated his constitutional
rights under the First and Eighth Amendments. Am.
Compl. (Dkt. No. 37). Presently pending is defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.

56. Dkt. No. 76. Scarbrough opposes this motion. Dkt.
No. 82. For the following reasons, it is recommended that
defendants' motion for summary judgment be granted in
part and denied in part.

**I. Background**

The facts are related in the light most favorable to
Scarbrough as the non-moving party. *See* subsection II(A)
*infra.* At all relevant time periods, Scarbrough was an
inmate at Upstate Correctional Facility ("Upstate"). Am.
Compl. ¶ 3.

**A. Cell Flooding**

On the morning of December 31, 2009, Scarbrough
was flushing the toilet in his cell when it began to
overflow. Am. Compl. ¶ 25. Upon Scarbrough's call out
for assistance, defendant Burgess, a corrections officer,
arrived at the cell. *Id.* ¶¶ 28, 31. Despite Scarbrough's
explanation that the flooding was accidental, Burgess
informed Scarbrough that he was lodging a misbehavior
report against Scarbrough for intentionally flooding the
prison gallery, resulting in the reduction of Scarbrough's
Progressive Inmate Movement System ("PIMS") Level
from a 3 to a 1. *Id.* ¶ 32. This required Scarbrough to
move to another cell.[3] *Id.* ¶ 32; Scarbrough Dep. at 21–22.
Scarbrough refused to move before a disciplinary hearing
was conducted. Am. Compl. ¶¶ 36, 38, 88. Thereafter,
Burgess left Scarbrough's cell. *Id.* ¶ 39.

During his deposition, Scarbrough testified to the
following on the issuance of a misbehavior report before
a cell transfer:

Q: Isn't it true that the officers do not have to wait to
have a misbehavior report written, and then have that
misbehavior report acted upon before an inmate is
moved from one cell to another?

A: They do that. But I also seen people cash tickets and
stay in the same cell until they are given their hearing.
And then they go downstairs because they were found
guilty.

Q: That's the decision of the officers to make, not the
inmates to make, though[,] correct?

A: I'm not saying that I made any decision. I didn't do nothing wrong. You know what I'm saying? ... The people that came to my cell wasn't trying to hear me.... Scarbrough Dep. at 28–29. As to whether he refused to move out of the cell, Scarbrough testified to the following:

Q: What I'm talking about is what happened. And an officer came and told you [that] you had to move out of your cell—

A: Yes.

Q: —and you refused that?

A: Yeah. I wasn't really thinking, ... I ain't do nothing wrong.

...

Q: You realize that as you sit here today that the officers have the right to put you in whatever cell they choose[,] correct?

 **\*2** A: They shouldn't ....

...

Q: So ... if you were up at Upstate and an officer told you, you got to move out of your cell today, pack up, you're moving out of your cell, is it your position as you sit here today that you have the authority as an inmate to refuse that order? ...

A: That's when they got to have a sergeant come to your cell. And you explain to the sergeant what's going on.

*Id.* at 30–32.

### B. Cell Extraction

Shortly after Burgess left Scarbrough's cell, three other officers came to Scarbrough's cell and ordered him to voluntarily move to another cell. Defendant Thompson, a sergeant, entered Scarbrough's cell and told him to move to another cell because of his PIMS-level reduction. Am. Compl. ¶¶ 40, 42. Regardless of Thompson's order, Scarbrough refused to move and Thompson left the cell. *Id.* ¶ 43. The same exchange occurred between Scarbrough and defendant Salls, a lieutenant. *Id.* ¶ 45. Salls said to

Scarbrough, "[m]ake sure you have your boots on tight because we're coming in there, mother fu\* \* er...." *Id.* ¶ 46. Finally, defendant Donald Quinn, a captain, ordered Scarbrough to exit his cell. *Id.* ¶ 47. Scarbrough remained adamant that he did nothing wrong and refused to leave his cell. *Id.*

Certain DOCCS officials and employees granted authorization for the use of a chemical agent, the medical clearance for such use, and a potential cell extraction. Defendant Rock, a superintendent, authorized Thompson to use a chemical agent on Scarbrough and to conduct a cell extraction if necessary. Rock Decl. ¶ 5. Donald Quinn gave Thompson the final order to use a chemical agent and conduct a cell extraction if necessary. D. Quinn Decl. ¶ 5. Based on Scarbrough's medical records, defendant Travers, a nurse, determined that nothing in the records showed that a chemical agent could not be used against Scarbrough. Travers Decl. ¶ 6. Thereafter, Travers gave medical clearance for the use of a chemical agent against Scarbrough. *Id.*

Thompson returned to administer five applications of a chemical agent. Am. Compl. ¶ 49. Between each application of the chemical agent, Thompson repeatedly ordered Scarbrough to come to the door. Ex. B— Handheld video (submitted with Defs.' Mot. for Summ. J.) (Dkt. No. 76–14). [4] Before the last application, an officer remarked, "appears hiding something in his hand" and "appears to be sock with something in it." *Id.*

After the last application of the chemical agent, Thompson ordered corrections officers and defendants Arquitt, Smith, Gary, Truax, and Clark to enter the cell. Am. Compl. ¶¶ 50–51. Defendant Matejaik manually opened the hatch cover to the cell door and defendant Reynolds manually opened the cell door for the correction officers to enter. *Id.* ¶¶ 52–53. Before entering the cell, something had to be pushed away from the door to the cell in order for the officers to enter the cell. [5] Ex. B— Handheld Video.

 **\*3** When the extraction team entered the cell, one of them held what resembled a broom handle. Ex. B—Handheld Video. Scarbrough alleged that he was already down, subdued, and not resisting, when the officers entered and beat him with batons, kicked him in the face, head, and back, and told him to stop litigating against the staff. Am. Compl. ¶¶ 54, 89. While he was unable to identify

precisely what each officer did because he was blinded by the chemical agent, Scarbrough contends that the officer who was on the ground told him to stop filing lawsuits. Am. Compl. ¶ 60; Scarbrough Dep. at 40–41. Gary was the officer on the ground with Scarbrough. Gary Decl. ¶ 5.

The named defendants involved in the extraction identified the conduct that they carried out. As an initial matter, defendants contend that when the extraction team entered the cell, Scarbrough used a tube sock loaded with four bars of soap to strike the team. [6] Arquitt entered first, using a shield. Arquitt Decl. ¶ 2. Gary was the second officer to enter the cell and saw Scarbrough swing a weapon that struck Arquitt's shield. Gary Decl. ¶ 5; Arquitt Decl. ¶ 2. Gary struck Scarbrough with a baton in the upper right forearm and Scarbrough released the weapon. [7] Gary Decl. ¶ 5; Dkt. No. 76–23, at 2. Arquitt grabbed Scarbrough by the shoulder area with both hands and forced him to the floor. Dkt. No. 76–23 at 2. Gary dropped to the floor with Scarbrough and grabbed his right shoulder. Gary Decl. ¶ 5. Truax grabbed Scarbrough's left shoulder with his left hand and the right shoulder with his right hand. Truax Decl. ¶ 5. Smith grabbed Scarbrough's left arm. Smith Decl. ¶ 5. Clark, the last officer to enter the cell, placed his hands on Scarbrough's left shoulder area while Scarbrough was on the ground. Clark Decl. ¶ 5. Gary grabbed Scarbrough's right arm with both hands and applied the handcuffs. Gary Decl. ¶ 5. The video does not clearly capture the events of the cell extraction, including the officers' entry and restraining of Scarbrough, all of which took approximately fifty seconds. Ex. B—Handheld video. However, the viewer's first sighting of Scarbrough is him already down on the ground. *Id.*

Gary and Arquitt removed Scarbrough's clothes with scissors. Gary Mem. at 1; Dkt. No. 76–23 at 12. Clark escorted Scarbrough to the decontamination shower, then to the lower holding area for a medical examination and photos to be taken, and finally, returned Scarbrough to his cell where a retention strap was applied. Clark Mem. at 1.

Scarbrough denies that he swung a sock of soaps against the extraction team or placed a mattress in front of the door to prevent the cell extraction. Scarbrough Dep. at 82, 110, 162; Am. Compl. ¶ 86. A DOCCS videotape showed that something was kicked out of the cell before the extraction team entered and something was then handed out of the cell shortly after the team entered the cell

and encountered Scarbrough. Ex. A—Corridor Camera at 20:58, 21:35.

**\*4** Scarbrough sustained a cut above his left eye-brow and bruising over his right eye as a result of the assault. Scarbrough Dep. at 45; Dkt. No. 76–19 at 2. Video evidence showed that when Scarbrough emerged from his cell, his entire face was covered with blood. Ex. B—Handheld Video. Scarbrough was bleeding and spitting up blood while undergoing decontamination in the shower. *Id.*

Scarbrough contends that his head was pushed against a wall with "blunt force" while the officers who cut off his clothing had also purposely cut him. Am. Compl. ¶¶ 61–62; Scarbrough Dep. at 92. Video evidence only showed that Scarbrough was held up in a stationary position against a wall while his clothing was removed. Ex. B—Handheld Video. Scarbrough felt that he was going to fall but the officers told him that they were holding him up. *Id.* Scarbrough complained about his foot because it was held against the wall and his fingers because they were being bent. *Id.* At one point, Scarbrough said that his face was bleeding because he was kicked in the face but someone responded, "nobody kicked you in the face," to which Scarbrough replied, "I know." *Id.*

Scarbrough was taken to a holding pen for photos to be taken by defendant Gettmann, a sergeant, as well as a medical examination administered by Travers. [8] Am. Compl. ¶¶ 63, 66. Despite his complaints regarding pains in his head and back, Scarbrough refused Travers's medical care, claiming that he had pre-existing conflicts with Travers and requested medical attention provided by another nurse. *Id.* ¶¶ 64, 67. Scarbrough testified that Travers should have sent him to another medical staff member for treatment and ensured that he received medical care before returning to his cell. Scarbrough Dep. at 36–37.

Scarbrough received two misbehavior reports, one for flooding his cell and one for the cell extraction. Scarbrough Dep. at 99. DOCCS records noted that the incident was triggered by a denial of a sick call by a nurse because Scarbrough did not follow proper procedures and was told to sign up for sick call the following day. Dkt. No. 76–23 at 35. Scarbrough contends that had non-party Lieutenant Durgan properly reviewed the report, the report would have showed that he called out for

assistance, there were problems with the pipes at Upstate prior to the alleged over flowing, and he did not swing a weapon at the officers. Pl.'s Response at 7.

### C. Post–Cell Extraction

At 12:10 am the next day, Scarbrough agreed to a medical evaluation, was escorted to the outside facility Alice Hyde Medical Center ("Alice Hyde"), and was seen by non-party Nurse Atkinson. Am. Compl. ¶ 70. Scarbrough received approximately twenty-five stitches for a cut above his upper left eye-brow. *Id.* ¶ 80. Since the cell extraction, Scarbrough continued to experience problems with his breathing and vision as well as pains in the head, back, spine, and collar bone. Am. Compl. ¶ 81.

**\*5** Upon Scarbrough's return to Upstate, he was assigned a cell mate. Am. Compl. ¶ 74. Shortly after his return, Scarbrough was attacked by that cell mate after he "exhibited complications with mental disorders." *Id.* ¶ 75. Scarbrough received a misbehavior report for engaging in a fight. [9] Pl.'s Response at 6.

As a result of the cell extraction, Scarbrough was sentenced to twelve months of confinement in the Special Housing Unit ("SHU") [10] and loss of good time credits. Scarbrough Dep. at 48–49. Scarbrough appealed this disciplinary hearing disposition; however, it was denied. *Id.* at 49–50. Scarbrough also filed grievances with regard to the cell extraction incident; however, all such grievances were denied and affirmed on appeal. Am. Compl. ¶¶ 83–84.

On January 12, 2010, between two and five o'clock in the afternoon, an unnamed sergeant came to Scarbrough's cell and told Scarbrough that the reason for the assault was partly due to his ongoing litigation and partly due to talking back at officers. Am. Compl. ¶ 85. [11]

On July 23, 2010, Scarbrough commenced this instant action. Compl. (Dkt. No. 1). On July 19, 2011, the Court granted Scarbrough's motion to amend his complaint, adding the following parties as defendants: Paul Burgess; Robert H. Reynolds; John Matejaik; Steven Salls; Thomas Quinn; Donald Quinn; Gary Gettmann; Marla Travers; and David Rock. Decision and Order (Dkt. No. 34) at 3; Am. Compl. Scarbrough seeks a

declaratory judgment against defendants for violating his constitutional rights, injunctive relief in the form of both a physical and mental health medical examination, nominal damages, compensatory damages, and punitive damages. Am. Compl. ¶¶ 97–102.

### II. Discussion

Liberally construing Scarbrough's complaint, Scarbrough has alleged that: (1) defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark violated his Eighth Amendment rights by using excessive force during the cell extraction on December 31, 2009; (2) defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann violated his Eighth Amendment rights by failing to intervene to protect him from the use of excessive force; (3) defendant Travers violated his Eighth Amendment rights by acting with deliberate indifference when she failed to provide him with medical care; (4) defendant Burgess violated his constitutional rights solely by lodging a false misbehavior report against him; and (5) defendant Gary violated his First Amendment rights by using excessive force against him in retaliation for filing lawsuits.

Defendants contend that Scarbrough's: (1) excessive force claims must fail because the video evidence of the cell extraction proves that no rational finder of fact would find in Scarbrough's favor; (2) failure to intervene claims must fail based on the lack of personal involvement of the named defendants; (3) medical indifference claim against Travers must fail because Scarbrough refused medical care that Travers had offered; and (4) claim that is based upon an alleged false misbehavior report is without merit. Alternatively, defendants claim that they are entitled to qualified immunity. Defendants do not address Scarbrough's retaliation claim against Gary.

### A. Legal Standard

**\*6** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

motion. *Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

## B. Eighth Amendment

**\*7** The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Eighth Amendment obligations include the duty to protect prisoners from other known harms. *Farmer v. Brennan,* 511 U.S. 825, 829 (1970); *Matthews v. Armitage,* 36 F.Supp.2d 121, 124 (N.D.N.Y.1999) (citations omitted). It also includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional

recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*8** Here, Scarbrough has satisfied the objective prong of the analysis. Considering it is undisputed that as a result of the cell extraction, Scarbrough sustained a cut above his left eyebrow requiring twenty-five stitches, such an injury can be fairly classified as a serious medical need. Moreover, when viewing the facts in the light most favorable to the plaintiff, and considering how Scarbrough acquired the injuries, an issue of material fact arises with respect to the subjective prong of the analysis.

Scarbrough and the defendants posit contrary recitations of fact with regard to the cell extraction. Defendants contend that upon the extraction team's entry into the cell, Scarbrough swung a sock of soaps at them, to which Arquitt blocked with a shield. Gary then struck Scarbrough's upper right forearm in order to compel Scarbrough to release the weapon. Conversely, Scarbrough maintains that he was already down on the ground, subdued, and not resisting, when the team entered. Further, Scarbrough adamantly maintains that he did not swing any weapon at the extraction team. What is undisputed is the fact that Scarbrough emerged from the cell with a gash above one eyebrow and a bruise above

the other. The video evidence does not resolve these issues of fact to the point that no rational finder of fact could find in favor of Scarbrough because the video does not show: (1) Scarbrough and what he was holding before defendants entered his cell; (2) how Scarbrough ended up on the ground; and (3) how defendants applied the restraints. This competing evidence rests on the credibility of Scarbrough on one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party leaves no choice but to credit Scarbrough's version of the events for purposes of this motion. *See In re Dana Corp.,* 574 F.3d 128, 152 (2d Cir.2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

Moreover, Scarbrough's evidence would also establish that he was weaponless and incapacitated by the chemical agents when the extraction team entered and that the use of force was unnecessary to extract Scarbrough from the flooded cell. Despite Scarbrough's repeated refusals to voluntarily exit his cell, defendants' actions in assaulting this inmate could constitute a *per se* constitutional violation that could not be resolved by a motion for summary judgment. Thus, viewing the facts in the light most favorable to Scarbrough, he has proffered sufficient evidence to raise an issue of material fact as to the subjective prong of the Eighth Amendment analysis to require resolution by a jury. Accordingly, defendants' motion on this ground should be denied.

### 2. Personal Involvement

**\*9** Defendants contend that Scarbrough failed to establish the personal involvement of Reynolds, Matejaik, Salls, Gettmann, Rock, Thomas Quinn, and Donald Quinn. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986)). [12]

### a. Reynolds and Matejaik

Scarbrough contends that Reynolds opened the door, and Matejaik opened the hatch cover, to his cell; therefore, their actions allowed for the alleged use of excessive force that ensued. However, these claims did not involve either defendants' direct participation in the alleged constitutional violation as Scarbrough does not claim that the defendants were present during the assault such that they either directly participated in, or could have directly prevented its occurrence. Even assuming defendants remained at their positions when the extraction team entered, the record is devoid of evidence supporting the defendants' availability to intervene. Accordingly, defendants' motion on this ground should be granted.

### b. Salls

Scarbrough contends that Lieutenant Salls verbally harassed him before the extraction team entered his cell; thereby, failing to intervene to protect him from the assault that ensued. This allegation neither demonstrates that Salls directly participated in the failure to intervene to protect Scarbrough from the use of excessive force nor that Salls had knowledge of the alleged constitutional violation prior to its occurrence and failed to prevent its occurrence. While Scarbrough alleged that Salls

warned him to tighten his boots in preparation for the extraction, no facts were alleged to support that Salls knew excessive force was to be used on Scarbrough during the extraction. Further Scarbrough does not allege that Salls created or allowed the continuance of any policy or custom under which unconstitutional practices occurred, was grossly negligent in his supervision of other subordinates, or exhibited deliberate indifference to his rights by failing to act on information indicating that unconstitutional acts had occurred. Moreover, a claim of threats and harassment alone, without allegations of accompanied injury or use of force, is insufficient to state an Eighth Amendment claim. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir.1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico*, 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983."). Thus, Scarbrough has failed to allege the personal involvement of Salls. Accordingly, defendants' motion on this ground should be granted.

### c. Gettmann

**\*10** Scarbrough contends that Gettmann failed to protect him from the use of excessive force by videotaping the cell extraction. Assuming excessive force was used on Scarbrough, because Scarbrough's claim concerned Gettmann's presence during the assault and direct failure to intervene, Scarbrough has sufficiently alleged Gettmann's personal involvement. Accordingly, defendants' motion on this ground should be denied.

### d. Rock and Donald Quinn

Scarbrough contends that both Rock and Donald Quinn failed to intervene to protect him from the use of excessive force because they were supervisors who authorized the use of chemical agents against him and a cell extraction if necessary. Such claims do not allege that Rock or Donald Quinn had directly failed to intervene to protect Scarbrough from excessive force or they knew that excessive force was to be used on

2012 WL 7761439

Scarbrough. Further, "mere linkage in the prison chain of command is insufficient to implicate" a defendant's personal involvement. *Richard v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal citations omitted). While Scarbrough alleged that Donald Quinn ordered him to leave his cell, there is nothing in the record indicating that Donald Quinn was present for the extraction and available to intervene in the alleged excessive use of force. Accordingly, defendants' motion on this ground should be granted.

### e. Thomas Quinn

Scarbrough names Thomas Quinn as a defendant. However, because Scarbrough does not allege any facts concerning any wrongdoing against Thomas Quinn, and the record does not show otherwise, Scarbrough has failed to allege that Thomas Quinn was either directly or indirectly involved in any of the alleged constitutional violations. Even drawing all inferences in Scarbrough's favor, without having any indication of what Thomas Quinn allegedly did, or did not do, there is no way to conclude that he was personally involved in any of the complained of events. Accordingly, defendants' motion should be granted on this ground and Thomas Quinn should be dismissed as a defendant.

### 3. Failure to Intervene

Assuming none of the defendants' personal involvement defenses are granted, Scarbrough's contention that defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann failed to intervene to protect him from excessive force must be addressed. Prison officials are obliged to protect prisoners from known harms. *Farmer,* 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). To establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.*

*11 Here, construing the complaint liberally, Scarbrough first contends that Salls knew or should have known that Scarbrough was to face excessive force when the extraction team was later called to remove Scarbrough from his cell because Salls warned him to tighten up his boots. However, such a conclusory and speculative statement does not show that a reasonable person has been warned that a constitutional violation was about to occur. In addition, there is nothing in the record demonstrating that Salls was aware that an assault was planned or had a realistic opportunity to intervene and prevent the harm when the video evidence showed that the alleged use of excessive force took place within fifty seconds. Thus, Scarbrough's claim against Salls must fail.

Second, Scarbrough contends that because Reynolds and Matejaik opened the cell door and hatch cover to his cell, they could have intervened in the alleged excessive use of force that ensued. However, a reasonable person carrying out the same actions would not be alerted that a constitutional violation would follow. Moreover, assuming both defendants stayed at their positions— outside of the cell while the extraction team entered— the record does not support an inference that there was a reasonable opportunity to intervene in light of the brief extraction time of fifty seconds. Thus, Scarbrough's claim against Reynolds and Matejaik must fail.

Third, Scarbrough contends that because Gettmann videotaped the entire cell extraction, Gettmann saw the use of excessive force and could have intervened to prevent the constitutional violation from occurring. However, in light of the number of people in the cell and the relatively short period of time of fifty seconds when the alleged excessive force was used, it is unreasonable to conclude that Gettmann was confronted with a reasonable opportunity to identify a constitutional violation in which he could have intervened. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (holding that an Eighth Amendment violation does not occur for failing to intervene when the assault occurs so quickly that the defendant "had no realistic opportunity to attempt to prevent them [because the event was not] of sufficient duration to support a conclusion that an officer who stood by without trying to assist ... became a tacit collaborator."). Therefore, Scarbrough's claim against Gettmann must also fail.

Lastly, Scarbrough contends that because Rock and Donald Quinn authorized the cell extraction, both Rock and Donald Quinn had a reasonable opportunity to intervene on his behalf. Similar to the reasoning above, such actions would not warn a reasonable person that a constitutional violation was about to occur.

Accordingly, defendants' motion on this ground should be granted.

### 4. Medical Indifference

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson,* 503 U.S. at 9). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (*citing Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*12** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

In this case, it is undisputed that Scarbrough's injuries constituted a serious medical condition since Travers offered Scarbrough medical care. However, Scarbrough's contention that upon his refusal of Travers's care, Travers should have sought medical care on his behalf from another nurse is without merit. First, since Scarbrough is not entitled to the treatment of his choice, it follows that he is not entitled to receive treatment from a person of his choice. Thus, any alleged delay or interference in treatment was due to Scarbrough's own actions. This cannot now be transformed into an Eighth Amendment claim. Moreover, Scarbrough ultimately received medical treatment. *Perez v. Hawk,* 302 F.Supp.2d 9, 21 (E.D.N.Y.2004) (citation omitted) ("treatment of a [plaintiff's] medical condition 'generally defeats a claim of deliberate indifference.' "). Such treatment was provided the following day and resolved the condition, despite Scarbrough's prior refusals. In addition, any complaints regarding such treatment were not against Travers because she did not provide it. Therefore, the record shows that Scarbrough has failed to establish deliberate indifference on the part of Travers. Accordingly, defendants' motion on this ground should be granted and Travers should be dismissed from this action.

### C. False Misbehavior Report

Construing the plaintiff's complaint liberally, Scarbrough alleged that Burgess violated his constitutional rights solely by lodging a false misbehavior report against him. The Second Circuit has repeatedly held that the issuing of false charges by a corrections officer against an inmate does not constitute a *per se* constitutional violation under § 1983. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1007) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). A false misbehavior report may constitute a constitutional violation when there is more such as "retaliation against the prisoner for exercising a constitutional right." *Id.* (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Further, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in [any] constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). Here, because Scarbrough's claim is based solely on an allegedly false misbehavior report without alleging more wrongdoing on Burgess's part, Scarbrough's assertion against Burgess must fail as a matter of law. Accordingly, defendants' motion on this ground should be granted.

### D. Retaliation

**\*13** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008).

"Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson,* 549 F.Supp.2d at 214–15. Therefore, conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Here, Scarbrough successfully meets the first element for the filing of lawsuits is a constitutionally protected activity. *Graham,* 89 F.3d at 80. Scarbrough also meets the third element because he filed a lawsuit against Upstate employees on July 28, 2009, which satisfies the temporal proximity for a causal connection. Am. Compl. ¶ 21 (*Scarbrough v. Evans,* No. 09–CV–0850 (NAM) (DEP) (appeal dismissed on September 26, 2011)). However, a genuine issue of material fact arises with the second element. Even though Scarbrough alleged that Gary told him to stop filing lawsuits while Gary was assisting in the cell extraction, the record evidence is in dispute as to whether the excessive use of force flowed from Scarbrough's lawsuit or Scarbrough's refusal to exit his cell. A determination of the second element cannot be clearly established, which results in an issue of credibility that is inappropriate to be decided for purposes of this motion. Noteworthy is the fact that defendants do not address this retaliation claim in their motion. Accordingly, Scarbrough's retaliation claim against Gary should remain.

### E. Qualified Immunity

**\*14** Defendants claim that even if Scarbrough's constitutional claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.),

Case 9:15-cv-01078-MAD-TWD Document 137 Filed 05/07/19 Page 74 of 75
Scarbrough v. Thompson, Not Reported in F.Supp.2d (2012)
2012 WL 7761439

*aff'd*, 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry must be discussed with regard to Scarbrough's Eighth Amendment excessive force and First Amendment retaliation claim. All other claims advanced in the complaint need not be reached because, as discussed *supra,* it has not been shown that defendants violated Scarbrough's constitutional rights.

There is no question that it was well-settled on December 31, 2009 that the Eighth Amendment prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate. *See Hudson,* 503 U.S. at 9–10. It was also well-settled on the same day that the First Amendment protected an inmate's right to file lawsuits. *Graham,* 89 F.3d at 80. Thus, accepting all of Scarbrough's allegations as true, qualified immunity cannot be granted to Thompson, Arquitt, Smith, Gary, Truax, and Clark for their alleged use of excessive force and Gary's alleged retaliatory conduct during the extraction. However,

defendants' motion should be granted in the alternative on this ground as to all other defendants, for all other claims.

### III. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 76) be:

A. **DENIED** as to Scarbrough's excessive force claims against defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark; AND

B. **GRANTED** as to all other claims and all other moving defendants and that the complaint be **DISMISSED** with prejudice as to those defendants; AND

2. Further **RECOMMENDED** that Scarbrough's retaliation claim against defendant Gary remain in this action.

**\*15** Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); Fed R. Civ. P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2012 WL 7761439

### Footnotes

1    The following defendants have been identified with their job positions: Paul Burgess, corrections officer; Robert H. Reynolds, corrections officer; John Matejaik, corrections officer; Steven Salls, lieutenant; Thomas Quinn, superintendent; Donald Quinn, captain; Gary Gettmann, sergeant; Marla Travers, nurse; and David Rock, superintendent. Am. Compl. (Dkt. No. 37) ¶ 31; Reynolds Decl. (Dkt. No. 76–20) ¶ 2; Matejaik Decl. (Dkt. No. 76–16) ¶ 2; Scarbrough Dep. (Dkt. No. 76–3) at 57; T. Quinn Decl. (Dkt. No. 76–24) ¶ 2; D. Quinn (Dkt. No. 76–11) ¶ 2; Gettmann Decl. (Dkt. No. 76–12) ¶ 2; Travers Decl. (Dkt. No. 76–18) ¶ 2; Rock Decl. (Dkt. No. 76–10) at ¶ 2.

2    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3    According to Scarbrough, Upstate employs a Progressive Inmate Movement System ("PIMS"), which categorizes inmates on a three-level merit system. Am. Compl. ¶¶ 33–34. Level–3 being the highest, it offers inmates various amenities that

are unavailable to lower levels. *Id.* ¶ 35. For example, a Level–3 inmate has recreation twice a day, four showers a week, and can keep thirty books in his cell. Scarbrough Dep. at 23.

4    Despite Scarbrough's complaints with regard to certain liberties he had while watching the videos as well as issues with identifying people in the videos, defendants satisfied the Court's text order by ensuring that Scarbrough reviewed the video recordings of his cell extraction. Dkt. report entry dated 3/22/2012; Dkt. Nos. 84, 85.

5    Defendants identified the barrier as a mattress and a pillow. Use of Force Report (Dkt. No. 76–23) at 12.

6    Defendants submitted a photo of the sock of soaps on the ground. Dkt. No. 76–15 at 8, 9. Defendants maintain that the sock of soaps was found on the floor near the shower in Scarbrough's cell. Dkt. No. 76–23 at 24.

7    Scarbrough maintains that he was never hit with a baton in the right arm; instead, he was hit in the back. Scarbrough Dep. at 43.

8    Scarbrough suspects that there is some sort of connection between Gettmann and Travers because Gettmann whispered something to Travers. Scarbrough Dep. at 47.

9    Scarbrough contends that had non-party Lieutenant Anctil properly reviewed the misbehavior report, DOCCS would not have assigned him a cell mate, which presented an opportunity for the fight that ensued. Pl.'s Response at 7. Scarbrough was attempting to allege a failure to intervene claim under the Eighth Amendment. However, Scarbrough does not allege any facts indicating which defendant assigned him a cell mate or placed him in the cell with a cell mate. Further, even if Scarbrough had alleged the claim against Anctil, Anctil is not a defendant in this action. Moreover, to establish liability under a failure to intervene claim, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). Because the record is devoid of any evidence supporting these three elements, such a speculative conclusion cannot survive a motion for summary judgment. *See McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("speculation alone is insufficient to defeat a motion for summary judgment). Accordingly, Scarbrough's potential failure to intervene claim against Anctil or any defendant with respect to the cell mate assignment must fail as a matter of law.

10   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

11   Here, Scarbrough attempts to allege a retaliation claim against an unnamed sergeant. However, Scarbrough does not name such a sergeant as a defendant in his amended complaint. Moreover, even if Scarbrough named this sergeant as a "John Doe," more than 120 days has passed since the filing of Scarbrough's amended complaint, the statutory limit for service of process on a defendant. FED. R. CIV. P. 4(m). Accordingly, all claims, if any, alleged against the said sergeant should be dismissed.

12   Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *See McCarroll v. Fed. Bureau of Prisons,* No. 08–CV–1343 (DNH/GHL), 2010 WL 4609379, *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed *Iqbal*'s impact on the five *Colon* factors, several district courts have done so); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon'*s personal involvement standard). The unpublished opinion cited *supra, McCarroll v. Fed. Bureau of Prisons,* is attached to this Recommendation.

---

End of Document                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.